**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No.

ELLIOT WILSTER, Derivatively On Behalf of RED ROBIN GOURMET BURGERS, INC.,

     Plaintiff,

v.

MICHAEL J. SNYDER, ROBERT J. MERULLO, JAMES T. ROTHE, GARY J. SINGER, DENNIS B. MULLEN, BENJAMIN D. GRAEBEL AND EDWARD T. HARVEY, JR.,

     Defendants,

-and-

RED ROBIN GOURMET BURGERS, INC., a Delaware corporation,

     Nominal Defendant.

---

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT AND**
**DEMAND FOR JURY TRIAL**

---

     Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein.

**INTRODUCTION**

     1.    This is a shareholder derivative action brought by a shareholder of Red Robin Gourmet Burgers, Inc. ("Red Robin" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state law, including breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment that occurred between November 8, 2004 and the present (the "Relevant Period") and that have caused substantial losses to Red Robin and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.       This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs.

3.       This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with Colorado so as to render the exercise of jurisdiction by the Colorado court permissible under traditional notions of fair play and substantial justice.

4.       Venue is proper in this Court because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Red Robin occurred in this District, and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## SUMMARY OF THE ACTION

5.       Red Robin, together with its subsidiaries, operates a casual dining restaurant chain that serves gourmet burgers in the United States and Canada.

6.       During the Relevant Period, defendants caused Red Robin to conceal improper self dealing by its CEO, conceal abuse of his corporate position by its Chief Executive Officer ("CEO"), and make decisions which have exposed the Company to liability in several class action lawsuits alleging violations of federal securities laws.  During the Relevant Period, the Company's stock to traded as high as $62.38 per share.  Defendants took advantage of the artificially inflated Red Robin stock and sold or otherwise disposed of 25,500 shares of their Red Robin stock, then valued at more than $1.2 million.

7.      The Relevant Period begins on November 8, 2004, when Red Robin filed a Form 8-K with the Securities and Exchange Commission ("SEC") disclosing its waiver under its Code of Ethics due to a potential conflict of interest with respect to its CEO's, defendant Michael J. Snyder ("Snyder"), and another officer's ownership in Mach Robin LLC ("Mach Robin"), a large Red Robin franchisee.  The Board acquiesced so much, that Mach Robin is the largest franchise group on the Red Robin system.  The Form 8-K referred investors to the Company's Web site for the Company's Code of Ethics.  The Code of Ethics, among other provisions, explicitly forbade the use of Red Robin's property for personal benefit.  Unbeknownst to the Company's shareholders, however, Snyder was also using Company aircraft and other assets for his personal use.  After an internal investigation which determined that some of Snyder's expenses were inconsistent with company policies, Snyder acknowledged his wrongdoing, and reimbursed the Company $1.25 million. Despite the reimbursement by Snyder for his various aircraft, travel and entertainment expenses, Red Robin's announcement regarding Snyder's misuse of company assets lead to a degradation of the Company's corporate image and damage to its market capitalization by over $230 million. Throughout the Relevant Period, defendants concealed these activities and also misrepresented the success of the Red Robin restaurants and improperly forecasted FY:05 revenues and earnings per share of $490-$498 million and $1.75-$1.78, respectively.  As a result of the concealment of the facts and affirmative misstatements, Red Robin stock increased to the $54-$55 per share range in late May 2005.  On May 25, 2005, Red Robin's CEO entered into a forward contract for the sale of 300,000 shares which he valued at $16.6 million on a Form 144.

8.      The true facts, which were known or should have been known by each of the defendants but concealed from the investing public during the Relevant Period, were as follows:

(a)     the Company lacked requisite internal controls and corporate governance procedures to safeguard the Company from abuse by the CEO of the Company;

(b)     the Company lacked requisite internal controls and corporate governance procedures to safeguard the Company from improperly approving a waiver granting the CEO and

another executive officer corporate opportunities outside of their capacity as officers of the Company; and,

(c)   the Company lacked the necessary personnel to issue accurate financial guidance, thereby subjecting the Company to several class action lawsuits regarding violations of federal securities laws.

9.   As a result of (a)-(c) above, the Company's market capitalization was severely damaged.

10.   As a result of defendants' actions, Red Robin's stock traded at artificially inflated prices of as high as $62.38 per share during the Relevant Period, which allowed its top officers to reap over a million dollars in insider trading proceeds.  However, after the above revelations entered the market, the Company's shares were hammered by massive sales of the Company's shares sending them down 25% from their Relevant Period high.

## THE PARTIES

11.   Plaintiff Elliot Wilster ("Wilster") is, and was at times relevant hereto, an owner and holder of Red Robin common stock.  Wilster is a citizen of Ohio.

12.   Nominal defendant Red Robin is a corporation organized and existing under the laws of the state of Delaware with its headquarters located at 6312 South Fiddler's Green Circle, Suite 200N, Greenwood Village, CO 80111.  The Company owns and operates, and franchises or licenses restaurants in the United States and Canada.  They are a casual dining restaurant chain focused on serving an imaginative selection of high quality gourmet burgers in a family-friendly atmosphere. There are more than 275 Red Robin locations across the United States and Canada, including both Company-owned locations and those operated under franchise or license agreements.

13.   Defendant Snyder was until August 11, 2005, Chairman, President, CEO, Chief Operating Officer and a director of Red Robin.  In addition to his positions with Red Robin, Snyder was a 31% owner in Mach Robin, the largest franchise group in the Red Robin system.  Because of Snyder's positions, he knew the adverse, non-public information about the business of Red Robin, as

well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Snyder abused his position of control by participating in self dealing, wasting of corporate assets, unjustly enriching himself, and activities which exposed Red Robin to possible liability for several class action securities lawsuits.  For FY:04, Red Robin paid defendant Snyder $1,065,127, in salary, bonus and other compensation, and granted him 80,000 options to purchase Red Robin stock.  Snyder is a citizen of Colorado.

14.     Defendant Robert J. Merullo ("Merullo") is, and at all times relevant hereto was, Vice President of Restaurant Operations for Red Robin.  In addition to his position with Red Robin, Merullo was a 7% owner in Mach Robin, the largest franchise group in the Red Robin system. Because of Merullo's position, he knew the adverse, non-public information about the business of Red Robin, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith.  During the Relevant Period, Merullo abused his position of control by participating in self dealing, wasting of corporate assets, unjustly enriching himself, and activities which exposed Red Robin to possible liability for several class action securities lawsuits.  For FY:04, Red Robin paid defendant Merullo $515,591, in salary, bonus and other compensation, and granted him 10,000 options to purchase Red Robin stock. During the Relevant Period, Merullo sold 14,000 shares of Red Robin stock for proceeds of $661,241.48.  Merullo is a citizen of Colorado.

15.     Defendant James T. Rothe ("Rothe") is, and at all times relevant hereto was, a director of Red Robin.  Because of Rothe's position, he knew the adverse, non-public information about the business of Red Robin, specifically, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information

provided to him in connection therewith.  During the Relevant Period, Rothe knew of, caused, allowed, or endorsed Snyder's abuse of his position, Snyder's self dealings, and the activities which exposed Red Robin to possible liability for several class action securities lawsuits.  Rothe is a citizen of Colorado.

16.     Defendant Gary J. Singer ("Singer") is, and at all times relevant hereto was, a director of Red Robin.  Because of Singer's position, he knew the adverse, non-public information about the business of Red Robin, specifically, as well as its finances, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Singer knew of, caused, allowed, or endorsed Snyder's abuse of his position, Snyder's self dealings, and the activities which exposed Red Robin to possible liability for several class action securities lawsuits.  Singer is a citizen of California.

17.     Defendant Dennis B. Mullen ("Mullen") is, and at all times relevant hereto was, a director of Red Robin.  On August 11, 2005, the Company announced the appointment of Mullen, a Company director since 2002, as Chairman of the Board and CEO.  Because of Mullen's position, he knew the adverse, non-public information about the business of  Red Robin, as well as its finances, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Mullen knew of, caused, allowed, or endorsed Snyder's abuse of his position, Snyder's self dealings, and the activities which exposed Red Robin to possible liability for several class action securities lawsuits. During the Relevant Period, Mullen sold 4,500 shares of Red Robin stock for proceeds of $246,279.42.  Mullen is a citizen of Arizona.

18.     Defendant Benjamin D. Graebel ("Graebel") is, and at all times relevant hereto was, a director of Red Robin.  Because of Graebel's position, he knew the adverse, non-public information about the business of Red Robin, specifically, as well as its finances, via access to internal corporate

documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Graebel knew of, caused, allowed, or endorsed Snyder's abuse of his position, Snyder's self dealings, and the activities which exposed Red Robin to possible liability for several class action securities lawsuits. Graebel is a citizen of Colorado.

19.     Defendant Edward T. Harvey, Jr. ("Harvey") is, and at all times relevant hereto was, a director of Red Robin. Because of Harvey's position, he knew the adverse, non-public information about the business of Red Robin, specifically, as well as its finances, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Harvey knew of, caused, allowed, or endorsed Snyder's abuse of his position, Snyder's self dealings, and the activities which exposed Red Robin to possible liability for several class action securities lawsuits. During the Relevant Period, Harvey sold 7,000 shares of Red Robin stock for proceeds of $379,934.40  Harvey is a citizen of New Jersey.

20.     The defendants identified in ¶¶13, 15-19 are referred to herein as the "Director Defendants." The defendants identified in ¶¶13-14, 17 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶13-14, 17 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

21.     By reason of their positions as officers, directors and/or fiduciaries of Red Robin and because of their ability to control the business and corporate affairs of Red Robin, the Individual Defendants owed Red Robin and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Red Robin in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act

in furtherance of the best interests of Red Robin and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

22.     Each director and officer of the Company owes to Red Robin and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

23.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Red Robin, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Red Robin, each of the Individual Defendants had access to adverse, non-public information about the condition and operations of Red Robin, as well as defendant Snyder's abuse of his position.

24.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Red Robin, and was at all times acting within the course and scope of such agency.

25.     To discharge their duties, the officers and directors of Red Robin were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Red Robin were required to, among other things:

(a)     Refrain from acting upon material inside corporate information to benefit themselves;

(b)     Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)     Conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     Properly and accurately guide investors and analysts as to the true condition of the Company at any given time, including making accurate statements about the Company's use of its assets and financial prospects, and ensuring that the Company maintained an adequate system of internal controls such that the Company's CEO would not abuse his corporate position and the Company's financial reporting would be true and accurate at all times;

(e)     Remain informed as to how Red Robin conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)     Ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

26.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Red Robin, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has

been ratified by the remaining Individual Defendants who collectively comprised all of Red Robin's Board during the Relevant Period.

27.     The Individual Defendants breached their duties of loyalty and good faith by allowing or endorsing Snyder's improper conduct and approving a franchise agreement to Mach Robin, a company which Snyder and Merullo collectively own 38%, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct during the Relevant Period, the Company is now the subject of several class action lawsuits that allege violations of federal securities laws.  As a result, Red Robin has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     Costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(b)     Costs incurred in investigating and defending Red Robin and certain officers in the class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

28.     Moreover, these actions have irreparably damaged Red Robin's corporate image and goodwill.  For at least the foreseeable future, Red Robin will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Red Robin's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

29.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

30.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) allow and endorse Snyder's improper self-dealing; (ii) approve a franchise agreement to Mach Robin, owned in part by Snyder and Merullo; (iii)  participate in conduct which has subjected Red Robin to several class action securities lawsuits, and (iv) maintain the Individual Defendants' executive and directorial positions at Red Robin and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

31.    The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least November 8, 2004 and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the true fact that Red Robin's CEO was abusing his corporate position.  In addition, defendants' conduct has resulted in possible liability of the Company in several class action securities lawsuits for violations of federal securities laws.

32.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's CEO's abuse of his corporate position, including the approval of a franchise agreement to Mach Robin; to artificially inflate the price of Red Robin common stock so they could: (i) dispose of over $1.2 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof. The actions described herein occurred under the authority of the Board of Directors, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

33.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

34.     The Company owns and operates, and franchises or licenses restaurants in the United States and Canada.  They are a casual dining restaurant chain focused on serving an imaginative selection of high quality gourmet burgers in a family-friendly atmosphere.  There are more than 275 Red Robin locations across the United States and Canada, including both Company-owned locations and those operated under franchise or license agreements.

## RELEVANT STATEMENTS

35.     In late October 2004, Red Robin stock was trading at less than $42 per share.  On November 8, 2004, the Individual Defendants caused the Company to file a Form 8-K, which stated:

> On November 3, 2004, the Board of Directors of Red Robin Gourmet Burgers, Inc. (the "Company"), upon the recommendation of the Audit Committee, passed a resolution which grants a waiver of Item II F., Diversion of a Corporate Opportunity, under the Company's Code of Ethics.  This waiver was granted to the Company's Chief Executive Officer, Michael J. Snyder, and its Senior Vice President of Restaurant Operations, Robert J. Merullo.  Mr. Snyder abstained from the vote upon the Board of Directors' resolution.

> Mr. Snyder and Mr. Merullo own 31.0% and 7.0%, respectively, of Mach Robin, LLC (Mach Robin), which operates Red Robin restaurants in Illinois, New Mexico, Idaho and Nevada.  An entity controlled by Mach Robin also operates 18 Red Robin restaurants in two Canadian provinces.  The Board granted the waiver with respect to conflicts of interest resulting from a proposed area development agreement between Red Robin International, Inc. and Mach Robin granting a franchise development right to Mach Robin in Meridian, Idaho, a suburb of Boise, Idaho.

> The Audit Committee determined that the terms of the agreement were no less favorable to the Company than the terms that could have been negotiated with other, unrelated parties.

> ***The Company's Code of Ethics is posted on the Company's website at www.redrobin.com.***

36.   The Company encouraged investors to review its Code of Ethics in light of Snyder's dealings.

37.   The Company's Code of Ethics was described as follows:

I.   ***Doing Business in Keeping with Red Robin Gourmet Burgers' Core Values – Honor, Integrity, Seeking Knowledge and Having Fun***

Red Robin Gourmet Burgers, Inc. ("Red Robin" or the "Company") has adopted this Code of Ethics ("Code of Ethics") to make clear to you, its directors, officers and Team Members (collectively and individually "you"), what the Company expects of you as you conduct business for the Company.  Red Robin requires that you conduct business for the Company lawfully, ethically, fairly and impartially. This Code of Ethics states the standards and policies that you must follow as you conduct business for Red Robin.  In addition to the requirements of this Code of Ethics, the Company may impose separate requirements on you because of the types of decisions you make for the Company.  Understanding this Code of Ethics will help you conduct business for the Company in keeping with our core values – Honor, Integrity, Seeking Knowledge and Having Fun.

Red Robin intends to always conduct business in keeping with the law, fairly and ethically.  You must conduct business in a manner that is lawful, fair to those involved, ethical, and you must do so with integrity.  You must avoid conduct that may raise questions as to the Company's compliance with the law, that may raise questions as to whether you will be acting honestly, with integrity, or that could harm the reputation of the Company or embarrass the Company.

This Code of Ethics cannot address every ethical question you may face as you do business for the Company, so Red Robin expects and encourages you to ask questions and seek guidance regarding this Code of Ethics from the Compliance Officer identified below, and to discuss with the Compliance Officer whether proposed actions will comply with this Code of Ethics.

*       *       *

B.   ***Outside Activities***.  A conflict of interest may exist if:

- Your outside activities, such as a second job, community service, or political activities, prevent you from giving the necessary time and effort to your job with the Company; or

- An immediate family member, member of your household, or other close relative works for a vendor, supplier, competitor, or contractor or owns a significant interest in a vendor, supplier, competitor, or contractor.

If you have a conflict of interest, such as those described above, your loyalties may be divided.  You owe a duty of loyalty and confidentiality to both employers.  You must take special care to respect the loyalty and confidentiality you owe to both employers.  To avoid the appearance of a conflict of interest, you should disclose all potential conflicts of interest on a Disclosure Statement.

\*          \*          \*

B.      **_Insider Information_**.  As a Team Member, officer or director of Red Robin, you must agree in writing to abide by the Company's Insider Trading Policy.  You may obtain a copy of the Company's Insider Trading Policy from the Compliance Officer, or you may view a copy on the Company's intranet web site.   The Company's Insider Trading Policy implements Federal securities law and the laws of various states, which provide that you may not disclose to any outside person any material, nonpublic information about the Company, and you may not use any material, nonpublic information for your own benefit or the benefit of another person.  "Use" in this context typically means to trade in the Company's stock based on that material, non-public information.   Examples of "material, non-public information" include our earnings for a particular period prior to the time we issue a press release to the public stating our earnings for that period, estimates of future earnings, pending or proposed acquisitions, sales of significant assets, the declaration of a stock split, and any other information not known by the public that would be likely to affect the decision of an investor as to whether to invest in the Company's shares.  Violations of the Company's Insider Trading Policy or any of the Federal laws or state laws governing insider trading may subject you to severe criminal and civil penalties.  Please refer to Red Robin's Insider Trading Policy for a more complete discussion of this topic.

\*          \*          \*

B.      **_Improper Use of Company Assets and the Assets of Others_**.  You may not use Red Robin's property for personal benefit or other improper uses.  You may not sell, loan, use, give away, or discard any tangible or intangible Company property without written authorization from the Company officer who has responsibility for the asset in question.  You may not use the property of others, whether tangible or intangible, without their authorization. Almost everything that is recorded, whether it is recorded in writing, in sound, on film, or in software code, is subject to a copyright in favor of its author.  Copyrighted works are entitled to legal protection against unauthorized copying.   Do not copy books or other written documents, audio recordings, photographs or movies, or software without written permission from the holder of the copyright.   The department head is responsible for obtaining the consent of the holder of the copyright to the work in question must assure that the consent of the holder has been obtained before making the copy or instructing any staff member to make the copy.  Your failure to observe the rights of others in their copyrights may subject you and Red Robin to fines and penalties under various Federal and state laws.

38.      The Form 8-K and the Code of Ethics were important to the market.  On November 16, 2004, the *Rocky Mountain News* published a story about Red Robin, which stated in part:

> Red Robin  Gourmet Burgers tells Web site visitors that the company's core values "create an unbridled culture . . .  Sometimes extraordinary things happen  as a result of our 'Unbridled' philosophy, we call these 'Unbridled Acts.'"
>
> The company's board of directors created another kind of unbridled act recently when it waived its code of ethics for its CEO, Mike Snyder, and its senior vice president of operations, Robert J. Merullo.

It seems that Snyder and Merullo, in addition to their roles as Red Robin executives, own just more than one-third of Mach Robin LLC. Mach Robin is a company that operates 32 Red Robin restaurants in Illinois, New Mexico, Idaho and Nevada and Canada.

Mach Robin has the area development agreement for Boise, Idaho, and plans to expand into nearby Meridian, Idaho. To do this, Red Robin had to waive its company code of ethics on "diversion of corporate opportunity" for Snyder and Merullo. Then, under the terms of the Sarbanes-Oxley corporate-governance law, it had to disclose the waiver in an 8-K filing with the Securities and Exchange Commission.

The code, posted on the Red Robin Web site says this: "You may not take advantage of a corporate opportunity yourself or give it to another person or firm. Your duty to the Company is to make sure that the Company knows of the opportunity and has a fair chance to decide whether to pursue that opportunity."

Chief Financial Officer James McCloskey said Red Robin, which has 130 company-owned stores and 116 franchised locations, "would never add one unit in Boise in the middle of a franchise territory," so it's not interested in an opportunity to engage in that business. "Any time that franchisee adds a store, we're going to have this waiver of the code of ethics."

What about the larger issue of having a CEO also be a franchisee? Doesn't Snyder benefit more from the dollars Mach Robin can keep away from Red Robin, rather than from the dollars Mach Robin sends to the corporate parent? In 2003, Mach Robin and its Canadian affiliate paid nearly $1.8 million in royalties to Red Robin.

McCloskey notes that Snyder was a franchisee before he ever joined the corporate parent. "What screwed it all up is they made Snyder the CEO," he jokes.

Why hasn't Snyder, who made more than $950,000 in salary and bonus in 2003, sold out his minority interest in Mach Robin? McCloskey says the Red Robin board is "legally focused" on potential conflicts and since "every (franchisee) gets the same deal, there aren't a lot of (ways), if Mike wanted to favor the franchisee, he could."

Also, McCloskey said that Snyder's Red Robin stock – he owns almost 10 percent of the company - represents a "much, much bigger risk" than Mach Robin. "He's not going to screw up Red Robin to help his franchise."

39.     Then, on August 11, 2005, after the market closed, the Individual Defendants caused

the Company to issue a press release announcing management changes. The press release stated in

part:

Red Robin Gourmet Burgers, Inc., today announced that it has named restaurant industry veteran Dennis B. Mullen as the Company's Chairman and Chief Executive Officer and elevated Eric C. Houseman to the position of President and Chief Operating Officer and Todd A. Brighton to the position of Senior Vice President and

Chief Development Officer. The Company also announced the retirement of Michael J. Snyder as Chairman of the Board, Chief Executive Officer and President. Mr. Snyder will serve as a consultant to the company and Mr. Mullen.

Mr. Mullen brings more than 30 years of experience in the restaurant and hospitality industry. He has served as chief executive officer for several restaurant chains, including Cork & Cleaver Restaurants of Denver, Colorado; Pedro Verde's Mexican Restaurants, Inc. of Boulder, Colorado; Garcia's Restaurants, Inc. of Phoenix, Arizona; and BCNW, a franchisee of Boston Chicken, Inc. in Seattle, Washington. Mr. Mullen started his professional career as an accountant with what is now PricewaterhouseCoopers. Since 1970, Mr. Mullen has served as a trustee of the Janus Funds. Mr. Mullen has served on Red Robin's board of directors since 2002.

Mr. Houseman has been associated with Red Robin since 1988, and has served as the Company's Vice President of Restaurant Operations since 2000. Mr. Brighton has been with Red Robin since 2001, serving as the Company's Vice President of Development.

In addition, the Company announced that Edward T. Harvey will continue to serve on the company's board of directors and has been appointed by the board to serve as Lead Director. Mr. Harvey has been a member of the Company's board of directors since 2000.

The Company also announced the resignation of Senior Vice President, James P. McCloskey.

These management and governance changes follow an internal investigation conducted by a special committee of the Company's board of directors relating to use of chartered aircraft and travel and entertainment expenses. The special committee, which retained independent counsel to conduct the investigation, identified various expenses by Mr. Snyder that were inconsistent with Company policies or that lacked sufficient documentation. Mr. Snyder has agreed to reimburse the Company for such expenses following completion of the special committee's review. The Company has notified the Securities and Exchange Commission of the internal investigation.

The Company believes that the expense amounts involved are not material to the Company's financial position or results of operations. In conjunction with Mr. Snyder's retirement and Mr. McCloskey's resignation, the company will record a non-cash charge in the third quarter of 2005 of approximately $2.8 million, or $1.8 million net of tax, for stock options that were accelerated and exercised in 2002.

40.     On August 12, 2005, after the August 11, 2005 press release detailing Snyder's retirement surrounding misconduct relating to a Red Robin chartered aircraft, travel and entertainment expenses, the Company's shares fell $14.24 per share, or 23%, to $45.55 per share on volume of 9.8 million shares.

## REASONS FOR THE IMPROPER CONDUCT

41.     During the Relevant Period, the Company:

(a)     lacked requisite internal controls and corporate governance procedures to safeguard the Company from abuse by the CEO of his position at the Company;

(b)     lacked requisite internal controls and corporate governance procedures to safeguard the Board from the improper approval of franchise agreements to Mach Robin, and waiver of a Diversion of Corporate Opportunity, to defendant Snyder and defendant Merullo; and

(c)     lacked requisite internal controls and corporate governance procedures to safeguard the Company from potential liability from class action lawsuits for violations of federal securities laws.

42.     As a result of (a)-(c) above, the Company suffered damages to its market capitalization of over $269.5 million.

43.     On August 11, 2005, the Individual Defendants caused Red Robin to report that Q2:05 results would be worse than expectations due to charges and adjustments to various accounts and that defendant Snyder had resigned in light of an investigation into his personal use of Company assets.  The announcement also disclosed that James P. McCloskey resigned.  After a belated internal investigation conducted by a special committee of the Board, which determined that some of Snyder's expenses were inconsistent with Company policies, Snyder reimbursed the Company $1.25 million.

44.     Despite the reimbursement by Snyder for his various aircraft, travel and entertainment expenses, Red Robin's announcement regarding Snyder's misuse of Company assets led to a degradation of the Company's corporate image and damage to its market capitalization by over $230 million.  At the same time that the defendants were causing Red Robin to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $1.2 million of their personally held stock.

## ILLEGAL INSIDER SELLING

45.     While in possession of the undisclosed material adverse information, the Insider

Selling Defendants sold the following shares of Red Robin stock:

| Name | Date | Shares | Price | Proceeds |
|------|------|--------|-------|----------|
| Robert Merullo | 11/10/2004 | 1600 | $47.09 | $75,344.00 |
| | 11/10/2004 | 1429 | $47.17 | $67,405.93 |
| | 11/10/2004 | 701 | $47.11 | $33,024.11 |
| | 11/10/2004 | 1100 | $47.10 | $51,810.00 |
| | 11/10/2004 | 1000 | $48.01 | $48,010.00 |
| | 11/10/2004 | 2870 | $47.12 | $135,234.40 |
| | 11/10/2004 | 100 | $47.15 | $4,715.00 |
| | 11/10/2004 | 1212 | $47.00 | $56,964.00 |
| | 11/10/2004 | 400 | $47.14 | $18,856.00 |
| | 11/10/2004 | 192 | $47.02 | $9,027.84 |
| | 11/10/2004 | 100 | $47.22 | $4,722.00 |
| | 11/10/2004 | 100 | $47.21 | $4,721.00 |
| | 11/10/2004 | 200 | $47.03 | $9,406.00 |
| | 11/10/2004 | 588 | $47.01 | $27,641.88 |
| | 11/10/2004 | 100 | $47.07 | $4,707.00 |
| | 11/10/2004 | 500 | $47.06 | $23,530.00 |
| | 11/10/2004 | 400 | $48.03 | $19,212.00 |
| | 11/10/2004 | 208 | $47.04 | $9,784.32 |
| | 11/10/2004 | 600 | $47.23 | $28,338.00 |
| | 11/10/2004 | 600 | $47.98 | $28,788.00 |
| | | **14000** | | **$661,241.48** |
| | | | | |
| Dennis Mullen | 6/16/2005 | 151 | $58.23 | $8,792.73 |
| | 6/16/2005 | 1349 | $58.21 | $78,525.29 |
| | 5/31/2005 | 600 | $54.95 | $32,972.40 |
| | 5/31/2005 | 100 | $54.98 | $5,498.00 |
| | 5/31/2005 | 300 | $54.97 | $16,491.00 |
| | 4/18/2005 | 1100 | $52.00 | $57,200.00 |
| | 4/18/2005 | 900 | $52.00 | $46,800.00 |
| | | **4500** | | **$246,279.42** |
| | | | | |
| Edward T. Harvey, Jr. | 6/3/2005 | 5417 | $55.00 | $297,935.00 |
| | 4/18/2005 | 1583 | $51.80 | $81,999.40 |
| | | **7000** | | **$379,934.40** |
| | | | | |
| **TOTAL** | | **12900** | | **$1,287,455.30** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

46.     Plaintiff brings this action derivatively in the right and for the benefit of Red Robin to redress injuries suffered, and to be suffered, by Red Robin as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Red Robin is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

47.     Plaintiff will adequately and fairly represent the interests of Red Robin in enforcing and prosecuting its rights.

48.     Plaintiff is and was an owner of the stock of Red Robin during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

49.     The current Board of Directors of Red Robin consists of the following five individuals: defendants Mullen, Harvey, Graebel, Rothe and Singer.  Plaintiff has not made any demand on the present Board of Directors of Red Robin to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

(a)     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse, non-public information regarding the CEO's abuse of his corporate position, and the improper approval of a franchise agreement and waiver of a Diversion of Corporate Opportunity, under the Code of Ethics to defendant Snyder and defendant Merullo.  While in possession of this material adverse, non-public information regarding the Company, the following current members of the Red Robin Board participated in the illegal insider selling:

(i)     During the Relevant Period, Mullen sold 4,500 shares of Red Robin stock for proceeds of $246,279.42; and

(ii)     During the Relevant Period, Harvey sold 7,000 shares of Red Robin stock for proceeds of $379,934.40.  Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested.  Also, these defendants face a substantial threat of liability for breach of their fiduciary duties for insider selling. Since  these directors have breached their fiduciary duties and are interested, any demand upon them is futile;

(b)     The Board is responsible for making sound and proper business decisions regarding Red Robin.  On November 3, 2004, the Board granted a waiver to Snyder and Merullo, who collectively own 38% of Mach Robin, regarding conflicts of interest resulting from a proposed area development agreement granting a franchise development right to Mach Robin in Idaho.  The Board breached their fiduciary duties by allowing Mach Robin, Snyder and Merullo, to gain from financial opportunities related to Red Robin. The Board's continual acquiescence to defendants Snyder and Merullo has resulted in Mach Robin becoming the largest franchise group in the Red Robin system.  Therefore, defendants Mullen, Harvey, Graebel, Singer and Rothe each face a substantial likelihood of liability for breach of their fiduciary duties owed to Red Robin. Accordingly, these defendants are interested and any demand upon them is futile;

(c)     According to Red Robin's Proxy Statement filed with the SEC on or about April 21, 2005, defendants Harvey, Graebel and Mullen were, during the Relevant Period, members of the Audit Committee.  The Audit Committee is responsible, by its charter, for monitoring the Company's compliance with its Code of Ethics which covers the conduct and ethical behavior of Red Robin's officers and employees.  The Company's Code of Ethics provides that Red Robin employees, including the CEO, may not use Red Robin's property for personal benefit or other improper uses. Nevertheless, the Audit Committee failed to properly monitor defendant Snyder's compliance with the Code of Ethics which resulted in a misuse of corporate assets.  The discovery of Snyder's waste of corporate assets has irreparably harmed Red Robin's corporate image and lead to over $230 million worth of damage to its market capitalization.  Additionally, the Audit Committee

recommended after investigation that the Board grant the waiver to Snyder and Merullo, explicitly authorizing their misconduct.  The Board followed the Audit Committee's recommendation and granted the waiver to allow Snyder and Merullo to benefit personally.  Therefore, defendants Harvey, Graebel and Mullen each face a substantial likelihood of liability for breach of their fiduciary duties owed to Red Robin.  Accordingly, these defendants are interested and any demand upon them is futile;

(d)      According to Red Robin's Proxy Statement, the Audit Committee is also responsible for assisting the Board in overseeing the accounting and financial reporting processes of the Company and audits of the financial statements of the Company and to prepare the annual report of the Audit Committee required by applicable SEC disclosure rules. Among the matters the Committee oversees are (a) the integrity of the Company's financial reporting process, systems of internal controls and financial statements; and (b) the Company's compliance with legal and regulatory requirements. The Audit Committee met seven times in 2004.  Nonetheless, the Audit Committee shirked its duty to maintain the integrity of Red Robin's internal controls and financial reporting process, thus exposing Red Robin to possible liability for several class action lawsuits for violations of federal securities laws, as described herein.  By such actions, defendants Harvey, Graebel and Mullen breached their duties by causing or allowing the improper financial guidance described above.  As a result of these defendants' breach of their duties, any demand upon them is futile;

(e)      The principal professional occupation of defendant Mullen is his employment with Red Robin, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  Accordingly, defendant Mullen lacks independence from defendants Harvey, Singer and Rothe, defendants who are not disinterested and/or independent and who exert influence over defendant Mullen's compensation by virtue of their positions as members of the Compensation Committee.  This lack of independence renders defendant Mullen incapable of impartially considering a demand to commence and vigorously prosecute this action;

(f)     Defendants Graebel, Harvey and Mullen by their specialized financial expertise, were in a unique position to understand the business of Red Robin, as well as its finances. Specifically, defendants Graebel, Harvey and Mullen were, during the Relevant Period, Audit Committee financial experts as defined by rules adopted by the SEC.  These defendants, because of their unique qualifications, had a heightened duty to insure the accuracy and fairness of Red Robin's financial reporting, which is currently the subject of several securities fraud class action lawsuits. Nonetheless, defendants Graebel, Harvey and Mullen breached their duties by causing or allowing the Company to be exposed to class action securities lawsuits for federal securities law violations. As a result of these defendants' breach of their duties, any demand upon them is futile;

(g)     Defendant Rothe, by his specialized expertise, was in a unique position to understand the responsibilities of a CEO to not abuse his corporate position.  Specifically, defendant Rothe was Professor of Business and Dean of the College of Business and Graduate School Administration at the University of Colorado at Colorado Springs.  Nonetheless, Rothe, because of his unique qualifications, breached his duties by causing, allowing, or endorsing the waiver of the Code of Ethics although defendant Snyder was abusing his corporate position.  As a result of this defendant's breach of his duties, any demand upon him is futile;

(h)     The entire Red Robin Board of Directors and senior management participated in the wrongs complained of herein.  Red Robin's directors are not disinterested or independent due to the following: defendants Mullen, Harvey, Graebel, Rothe and Singer served on the Red Robin Board during the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above referenced defendants breached the fiduciary duties that they owed to Red Robin and its shareholders in that they failed to prevent and correct the improper financial guidance.  Thus, the Red Robin Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally

in the outcome as it is their actions that have subjected Red Robin to millions of dollars in liability for possible violations of applicable securities laws;

(i)     Directors Harvey, Graebel, Rothe and Singer as non-employee directors each receive an annual retainer of $25,000, payable quarterly, and each non-employee director may receive one or more awards of non-qualified stock options up to a maximum of 5,000 stock options per year at the discretion of the Board of Directors.  In addition, each director receives $1,000 for each in-person Board meeting, and each committee member receives $1,000 for each in-person compensation or nominating committee meeting and $2,000 for each in-person Audit Committee meeting.  A director receives one-half of the compensation amount for scheduled in-person meetings attended by telephone.  Directors are also reimbursed for costs incurred by them in attending board and committee meetings. Accordingly, directors Harvey, Graebel, Rothe, and Singer are interested in maintaining their positions on the Board so as to safeguard their substantial compensation and unvested stock options.  Thus, demand upon these defendants is futile;

(j)     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein;

(k)     The Director Defendants of Red Robin, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Red Robin's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

(l)     In order to bring this suit, all of the directors of Red Robin would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

(m)     The acts complained of constitute violations of the fiduciary duties owed by Red Robin's officers and directors and these acts are incapable of ratification;

(n)     Any suit by the current directors of Red Robin to remedy these wrongs would likely expose the Individual Defendants and Red Robin to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves;

(o)     Red Robin has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Red Robin any part of the damages Red Robin suffered and will suffer thereby;

(p)     If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against them contained in class action complaints for violations of securities law, which admissions would impair their defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants.  In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions.  This they will not do.  Thus, demand is futile; and

(q)     If Red Robin's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Red Robin.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Red Robin against these defendants, known as, *inter alia*, the "insured

versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of Red Robin, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no directors' and officers' liability insurance at all then the current directors will not cause Red Robin to sue them, since they will face a large uninsured liability.

50.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board of Directors has failed and refused to seek recovery for Red Robin for any of the wrongdoing alleged by plaintiff herein.

51.     Plaintiff has not made any demand on shareholders of Red Robin to institute this action since such demand would be a futile and useless act for the following reasons:

a.      Red Robin is a publicly held company with over 16 million shares outstanding, and thousands of shareholders;

b.      Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

c.      Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

### COUNT I

**Against the Insider Selling Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

52.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

53.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Red Robin common stock on the basis of such information.

54.    The information described above was proprietary non-public information concerning the Company's operation.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Red Robin common stock.

55.    At the time of their stock sales, the Insider Selling Defendants knew that defendant Snyder was abusing his corporate position.  The Insider Selling Defendants' sales of Red Robin common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

56.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

57.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

58.    The Individual Defendants owed and owe Red Robin fiduciary obligations.  By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Red Robin the highest obligation of good faith, fair dealing, loyalty and due care.

59.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

60.    Each of the Individual Defendants had actual or constructive knowledge regarding defendant Snyder's abuse of his corporate position, and the waiver of conflicts of interest resulting from a proposed franchise development involving Snyder and Merullo.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

61.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Red Robin has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

62.     Plaintiff on behalf of Red Robin has no adequate remedy at law.

## COUNT III

### Against All Defendants for Abuse of Control

63.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

64.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Red Robin, for which they are legally responsible.

65.     As a direct and proximate result of the Individual Defendants' abuse of control, Red Robin has sustained significant damages.

66.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

67.     Plaintiff on behalf of Red Robin has no adequate remedy at law.

## COUNT IV

### Against All Defendants for Gross Mismanagement

68.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

69.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Red Robin in a manner consistent with the operations of a publicly held corporation.

70.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Red Robin has sustained significant damages in excess of millions of dollars.

71.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

72.     Plaintiff on behalf of Red Robin has no adequate remedy at law.

## COUNT V

### Against All Defendants for Waste of Corporate Assets

73.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

74.     As a result of allowing or endorsing defendant Snyder's abuse of his corporate position, a franchise development for a company owned in part by Snyder and Merullo, subjecting the Company to several class action suits involving federal securities violations, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Red Robin to waste valuable corporate assets

75.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

76.     Plaintiff on behalf of Red Robin has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Unjust Enrichment

77.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

78.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Red Robin.

79.     Plaintiff, as a shareholder and representative of Red Robin, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Red Robin has an effective remedy;

C.      Awarding to Red Robin restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  August 31, 2005              Respectfully submitted,

THE LAW OFFICES OF F. JAMES DONNELLY, P.C.


    */s/   F. James Donnelly*
F. JAMES DONNELLY

6076 S. Chester Way
Greenwood Village, CO 80111
Telephone: 720/493-9814
Facsimile: 720/493-9815
Email: fjamesdonnelly@comcast.net

ROBBINS UMEDA & FINK, LLP
BRIAN J. ROBBINS
MARC M. UMEDA
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

Attorneys for Plaintiff

Address of Plaintiff:

936 Lynita Drive
Brookfield, OH  44403